

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

JUDGE NATHAN

GERALD NUNGESTER, SHELIA NUNGESTER, JEFFREY PARKER and SANDRA PARKER, individually and on behalf of all others similarly situated,

      Plaintiffs,

      v.

AHMSI INSURANCE AGENCY INC. D/B/A BELT LINE INSURANCE AGENCY, HOMEWARD RESIDENTIAL HOLDINGS INC. F/K/A AMERICAN HOME MORTGAGE SERVICING, INC., QBE FINANCIAL INSTITUTION RISK SERVICES INC. F/K/A STERLING NATIONAL CORPORATION F/K/A ZC STERLING CORPORATION, QBE INSURANCE CORPORATION, QBE SPECIALTY INSURANCE COMPANY, WL ROSS & CO., LLC, WLR AHM CO-INVEST, L.P., WLR/GS MASTER CO-INVESTMENT,  L.P., WLR RECOVERY FUND III, L.P., WLR RECOVERY FUND IV, L.P., and WLR IV PARALLEL ESC, L.P.,

      Defendants.

14 CV 7338

Civil Action No.: _____

**CLASS ACTION COMPLAINT**

JURY TRIAL DEMANDED

ECF CASE



**TABLE OF CONTENTS**

**Page No.**

I.      NATURE OF THE ACTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     JURISDICTION AND VENUE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

III.    PARTIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        A.    Plaintiffs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        B.    Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

              1.    Homeward and AIA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

              2.    The WL Ross Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

              3.    The QBE Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

V.      SUBSTANTIVE ALLEGATIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        A.    Background:  Lender-Placed Insurance and Mortgage Servicing. . . . . . . . . . . . 10

        B.    WL Ross Acquires AHMSI. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        C.    AHMSI Enters Into a Six-Year Exclusive Arrangement With ZC Sterling. . . . . 13

        D.    QBE Insurance Group Acquires ZC Sterling. . . . . . . . . . . . . . . . . . . . . . . . . 15

        E.    The Sham and Collusive Rebate Transactions. . . . . . . . . . . . . . . . . . . . . . . . . 16

              1.    $10 Million as Purported Compensation Under a Bogus "Marketing Services" Agreement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

              2.    Warrants Worth $85 Million Awarded to Homeward's Shareholders. . . 17

              3.    More Than $16 Million in Phony "Insurance Commissions". . . . . . . . . 18

              4.    Approximately $25 Million in Below-Cost Services. . . . . . . . . . . . . . . 20

        F.    The Scheme Defrauded Plaintiffs and the Class. . . . . . . . . . . . . . . . . . . . . . . . 21

i

G.      The Scheme Defrauded Homeward's Servicing Clients. . . . . . . . . . . . . . . . . . . . 22

H.      Servicers Profit from Abusive Activities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

V.     DEFENDANTS' FRAUDULENT MAIL AND WIRE COMMUNICATIONS. . . . . . . . 25

VI.    NEW YORK STATE'S INVESTIGATION OF THE LPI INDUSTRY. . . . . . . . . . . . 27

A.      Superintendent Lawsky Launches an Investigation. . . . . . . . . . . . . . . . . . . . . . . 27

B.      QBE and Homeward Admit to the Essential Facts Regarding the Premium
Rebates. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

C.      QBE Pays New York $10 Million to Settle LPI-Related Claims. . . . . . . . . . . . 29

VII.   FANNIE MAE UNSUCCESSFULLY ATTEMPTS TO PUT AN END TO THE
OVERCHARGES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

A.      Fannie Mae Seeks Independent, Kickback-Free Bids for LPI and Tracking
Services. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

B.      The LPI Industry Lobbies the FHFA to "Spike" the Fannie Mae RFP. . . . . . . . 35

C.      The OIG of the FHFA Recommends that Fannie Mae Consider Suing QBE. . . . 36

VIII.  WL ROSS'S DOMINATION AND CONTROL OF HOMEWARD. . . . . . . . . . . . . . 37

IX.    TOLLING OF THE STATUTES OF LIMITATIONS. . . . . . . . . . . . . . . . . . . . . . . . 42

X.     CLASS ACTION ALLEGATIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

XI.    CLAIMS FOR RELIEF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

COUNT I

VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT
ORGANIZATIONS ACT, 18 U.S.C. §§ 1961-1968
(Against all Defendants). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

COUNT II

      CONSPIRACY TO VIOLATE THE RACKETEER INFLUENCED AND CORRUPT
      ORGANIZATIONS ACT, 18 U.S.C. § 1962(d)
      (Against all Defendants). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

COUNT III

      VIOLATION OF RESPA, 12 U.S.C. § 2607(a)
      (Against all Defendants). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

COUNT IV

      BREACH OF CONTRACT
      (Against Homeward and WL Ross). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

COUNT V

      BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
      (Against Homeward and WL Ross). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

COUNT VI

      COMMON LAW RESTITUTION/UNJUST ENRICHMENT/DISGORGEMENT
      (Against Homeward and WL Ross). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

PRAYER FOR RELIEF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

JURY TRIAL DEMANDED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

Plaintiffs Gerald Nungester, Shelia Nungester, Jeffrey Parker and Sandra Parker ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Plaintiffs' information and belief is based upon the investigation made by and through their attorneys, which included a review of public filings and statements made by defendants ("Defendants"), court and regulatory filings, transcripts of public hearings, regulatory settlements, documents publicly disclosed pursuant to the New York Freedom of Information Law, media articles, and other publicly available information. Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth below after a reasonable opportunity for discovery.

## I.      NATURE OF THE ACTION

1.      Plaintiffs bring this action pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq*. ("RICO"), and applicable state law, on behalf of themselves and a nationwide putative class consisting of residential mortgagors charged for lender-placed insurance ("LPI") in connection with loans serviced by Homeward Residential Holdings, Inc. ("Homeward") f/k/a American Home Mortgage Servicing Inc. ("AHMSI"), at any time from August 1, 2008 through August 31, 2014 (the "Class Period").

2.      Mortgages require borrowers to maintain homeowners insurance to protect the lender's interest in the secured property. If a borrower's homeowners insurance lapses, the lender is entitled to purchase LPI, "force place" it, and be indemnified by the borrower for the expense of the premium.

3.      Defendants perpetrated a scheme to overstate Homeward's LPI premium expenses, and, thereby, to recoup inflated amounts from borrowers. Pursuant to the scheme, Homeward's LPI

carriers, QBE Insurance Corporation and QBE Specialty Insurance Company (collectively, "QBE Insurance"), and their non-insurance affiliate, QBE Financial Institution Risk Services, Inc. ("QBE FIRST") (collectively, "QBE"), gave Homeward secret premium rebates, *i.e.*, kickbacks. Homeward had no right to be indemnified by borrowers for more than it actually spent for the LPI. Defendants thus should have subtracted the rebates, which materially reduced Homeward's premium costs, from the amounts that borrowers were billed. Defendants, however, fraudulently charged borrowers based on the full purported price of the premiums, *i.e.*, materially in excess of Homeward's true expense. This enabled Homeward to keep the rebates for itself.

4.      QBE paid the premium rebates in the form of cash, securities, and below-cost services, and as a *quid pro quo* for Homeward's agreement to award QBE a six-year contract as Homeward's exclusive LPI provider. Pursuant to the contract, QBE collected hundreds of millions of dollars from Homeward in LPI premiums, from which the rebates were paid.

5.      To carry out the scheme, Defendants conspired to, and did, conceal the rebates not only from borrowers, but also from regulators and Homeward's servicing clients, *i.e.*, the Government Sponsored Enterprises ("GSEs"), private securitization trusts, and other owners of whole loans that engaged Homeward to service borrowers' loans. Specifically, Defendants agreed to, and did, launder the rebates through multiple sham and collusive transactions involving affiliates and related parties. Those transactions included:

a.      **$10 million paid as purported compensation under a bogus "marketing services agreement."** As Homeward and QBE later admitted in sworn testimony to the New York State Department of Financial Services (the "DFS"), QBE paid Homeward $10 million under a supposed "marketing services" agreement. No such services, however, existed or were ever contemplated by the parties. Instead, the money simply constituted a disguised premium rebate.

2

b.  **Warrants worth $85 million awarded to Homeward's shareholders**. QBE's predecessor, ZC Sterling Corporation ("ZC Sterling") n/k/a QBE FIRST, issued warrants to the shareholders of Homeward, which were five private equity funds controlled by WL Ross & Co., LLC (collectively, "WL Ross"). The warrants entitled WL Ross to 15% of ZC Sterling's common stock. In December 2008, QBE Insurance Group acquired ZC Sterling for $575 million, thereby allowing WL Ross to convert the warrants to $85 million in cash – an unearned windfall. The award of the warrants served no legitimate business purpose, but simply constituted a secret premium rebate and blatant kickback.

c.  **More than $16 million in phony "insurance commissions."** QBE paid a purported third-party insurance agent, AHMSI Insurance Agency, Inc. ("AIA"), more than $16 million in supposed "insurance commissions" on Homeward's LPI. AIA, however, was not a *bona fid*e insurance agent. Instead, AIA was a shell company wholly-owned by Homeward which had no offices, employees, or operations independent of Homeward. Additionally, AIA never sold any insurance. AIA's sole function was to collect the "commissions" and transfer them to Homeward under the guise of compensating Homeward for the purported use of its "office space." The "commissions" and "office space" compensation constituted laundered premium rebates.

d.  **At least $25 million in below-cost services.** QBE FIRST, a non-insurance QBE affiliate, entered into a subcontracting agreement to perform certain loan servicing activities on Homeward's behalf. Notably, however, Homeward paid QBE FIRST only nominal consideration for this labor-intensive work. QBE FIRST secretly derived its actual compensation for these activities from QBE Insurance. Specifically, QBE Insurance paid QBE FIRST by funneling it money, *i.e.*, rebates, derived from Homeward's LPI premiums. Homeward thereby obtained below-cost loan tracking and escrow administration services via laundered premium rebates.

6.  Defendants also conspired to, and did, further the fraudulent scheme by issuing materially false and misleading communications to borrowers. The communications omitted disclosure of the rebates, overstated Homeward's LPI premium expenses, and demanded payment of inflated amounts from borrowers.

7.      Although this action is brought on behalf of a putative class of injured borrowers, Defendants' scheme also victimized Homeward's servicing clients, *i.e.*, the GSEs, securitization trusts, and other owners of whole loans that hired Homeward to service borrowers' loans.  Such servicing clients were obligated to reimburse Homeward for any LPI premium expenses not recouped from borrowers.  The LPI expenses constituted "advances" payable from foreclosure proceeds before remaining sums were passed to the servicing client.  To the extent borrowers defaulted, the servicing clients thus bore the inflated LPI bills in the form of reduced loan proceeds and higher loss severities.

8.      The Homeward servicing clients victimized by the scheme are believed to include Fannie Mae and Freddie Mac, which have received hundreds of billions of dollars in taxpayer bailouts in the aftermath of the Financial Crisis of 2007-08.  A substantial portion of the inflated charges alleged herein thus ultimately were paid by United States taxpayers.

9.      The fraud committed by Defendants against Homeward's servicing clients, including Fannie Mae and Freddie Mac, forms part of the "pattern of racketeering activity" alleged in this RICO lawsuit.

10.      On April 17, 2013, QBE entered into a Consent Order with the DFS agreeing to pay $10 million in penalties and to implement a set of "major reforms."  Specifically, QBE pledged, subject to certain conditions, to stop:  (i) paying purported "insurance commissions" to affiliates of loan servicers; (ii) providing "free or below-cost, outsourced services to banks, servicers or their affiliates;" and (iii) "making any payments" to servicers or their affiliates "in connection with securing business."  In other words, QBE paid a penalty for and agreed to stop engaging in the precise misconduct alleged in this lawsuit.

4

11.     By virtue of the acts alleged herein, Defendants violated RICO through predicate acts of mail fraud, wire fraud, "honest services" fraud, extortion, extortion attempt, extortion conspiracy, and money laundering.  Additionally, Homeward breached borrowers' mortgage loan agreements and the implied duties of good faith and fair dealing therein.  WL Ross is directly liable for its own violations, and vicariously liable for the violations committed by Homeward under the doctrines of piercing the corporate veil and agency.

## II.    JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367(a), and 18 U.S.C. § 1964(c).

13.     Personal jurisdiction is conferred by 18 U.S.C. § 1965(a), which allows a party to institute a civil RICO action in any district in which a defendant "resides, is found, has an agent, or transacts his affairs."  Alternatively, 18 U.S.C. § 1965(b) provides that as long as one defendant is subject to service in a particular district, additional parties residing in other districts may be brought before the forum court, in the court's discretion, to the extent that "the ends of justice require."

14.     Additionally, this Court has personal jurisdiction over Defendants because each systematically and continually conducts business throughout the State of New York.

15.     This Court also has original diversity jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2).  Plaintiffs are citizens of Florida and Texas.  Defendants are citizens of different states, the amount in controversy exceeds $5,000,000, and there are more than 100 members in the Class.

16.     This Court also has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

17.     Venue is proper in this district under 28 U.S.C. § 1391(b), 12 U.S.C. § 2614, and 18 U.S.C. §§ 1965(b) and (d).  Defendants regularly conduct business in this District.

III.   **PARTIES**

   **A.     Plaintiffs**

18.     Plaintiffs Gerald Nungester and Shelia Nungester are residents of the State of Texas. The Nungesters have a mortgage loan serviced by Homeward on property located at 6220 Ted Trout Drive, Lufkin, Texas.  Homeward charged the Nungesters at least $712.10 for LPI with respect to the period from at least September 2011 through April 2012.  Homeward purchased the LPI from QBE Specialty Insurance.

19.     Plaintiffs Jeffrey S. Parker and Sandra L. Parker are residents of the State of Florida. Prior to 2012, the Parkers had a mortgage loan serviced by Homeward on a property located at 3528 S. Haven Rd., Knoxville, Tennessee.  Homeward charged the Parkers at least $2,479.53 for LPI with respect to the period from October 2008 through September 2011.  Homeward purchased the LPI from QBE Insurance Corporation.

   **B.     Defendants**

      **1.     Homeward and AIA**

20.     Defendant Homeward is a Delaware corporation with its principal place of business located in Coppell, Texas.  Homeward is engaged in the business of loan servicing.  Homeward's loan servicing portfolio consists of in excess of 575,000 loans with an outstanding principal balance of approximately $150 billion.  On December 27, 2012, Homeward was acquired by Ocwen Financial Corp. ("Ocwen"), a public company headquartered in Atlanta, Georgia, whose shares trade on the New York Stock Exchange.  Homeward thereby became a wholly-owned subsidiary of

6

Ocwen.  Prior to its acquisition by Ocwen, Homeward was one of the largest independent mortgage loan servicers in the United States.  Prior to February 2012, Homeward was known as AHMSI.  A chart depicting Homeward's corporate history is set forth in Exhibit A.

21.     Defendant AIA is a Texas corporation with its purported principal place of business located in Coppell, Texas.  AIA is a wholly-owned and direct subsidiary of Homeward, specifically, a shell corporation that Homeward formed in or about the spring of 2008 for the sole purpose of laundering premium rebates disguised as "insurance commissions" from QBE.  At all times, AIA existed solely as a set of incorporation documents and book-keeping entries maintained by Homeward, with no offices, employees, or operations of its own.  AIA purports to do business under the name Belt Line Insurance Agency.

**2.     The WL Ross Defendants**

22.     Defendant WL Ross & Co., LLC ("WL Ross & Co."), is a Delaware limited liability fund management company with its principal place of business located in New York, New York. The Chief Executive Officer of WL Ross & Co. is billionaire private equity investor and turnaround specialist Mr. Wilbur L. Ross, Jr. ("Ross").  The sole member of WL Ross & Co. is Invesco Private Capital, Inc., a Delaware corporation that is indirectly owned by Invesco Ltd., which is a publicly-owned Bermuda corporation whose shares trade on the New York Stock Exchange.  WL Ross & Co. directly or indirectly manages and controls numerous private equity funds holding $8 billion in private investments.

23.     Defendant WLR Recovery Fund III, L.P. is a private equity fund organized as a Delaware limited partnership with its principal place of business located in New York, New York.

Its investment manager is WL Ross & Co., and  its  general partner is WLR Recovery Associates III LLC, a Delaware limited liability company directly and indirectly controlled by Ross.

24.     Defendant WLR Recovery Fund IV, L.P. is a private equity fund organized as a Delaware limited partnership with its principal place of business located in New York, New York. Its investment manager is WL Ross & Co., and its general partner is WLR Recovery Associates IV LLC, a Delaware limited liability company indirectly controlled by Ross.

25.     Defendant WLR AHM Co-Invest, L.P. is a private equity fund organized as a Delaware limited partnership with its principal place of business located in New York, New York. It is indirectly controlled by both WL Ross & Co. and Ross.

26.     Defendant WLR IV Parallel Esc, L.P. is a private equity fund organized as a Delaware limited partnership with its principal place of business located in New York, New York.  It is indirectly controlled by both WL Ross & Co. and Ross.

27.     Defendant WLR/GS Master Co-Investment, L.P. is a private equity fund believed to be organized as a Cayman Islands limited partnership with its principal place of business located in New York, New York.  It is indirectly controlled by both WL Ross & Co. and Ross.

28.     WLR Recovery Fund III, L.P., WLR Recovery Fund IV, L.P., WLR AHM Co-Invest, L.P., WLR IV Parallel Esc, L.P., and WLR/GS Master Co-Investment, L.P. are collectively referred to herein as the "WL Ross Funds."  WL Ross & Co. and the WL Ross Funds are collectively referred to herein as "WL Ross."

### 3.    The QBE Defendants

29.     Defendant QBE FIRST is a Delaware Corporation with its principal place of business located in Atlanta, Georgia.  QBE FIRST is not an insurance company or licensed or registered as

8

such in any state.  Instead, QBE FIRST is a loan servicing subcontractor and a purported "managing general agent" for various affiliates which are licensed insurance companies.  QBE FIRST is an indirect subsidiary of QBE Insurance Group, which is an Australian group holding company whose shares trade on the Australian Stock Exchange.  Prior to December 2008, QBE FIRST was known as ZC Sterling.  QBE Insurance Group acquired ZC Sterling in December 2008, whereupon ZC Sterling was renamed Sterling National Corporation.  In 2011, Sterling National Corporation was renamed QBE FIRST.  A chart depicting QBE FIRST's corporate history is set forth in Exhibit A.

30.     Defendant QBE Insurance Corporation is a Pennsylvania corporation with its principal place of business located in New York, New York.  QBE Insurance is a licensed property and casualty insurer that provides LPI to mortgage lenders and loan servicers throughout the United States.  Like QBE FIRST, QBE Insurance Corporation is an indirect subsidiary of QBE Insurance Group.

31.     Defendant QBE Specialty Insurance Company is a North Dakota corporation with its principal place of business located in Omaha, Nebraska.  QBE Specialty Insurance Company is a licensed property and casualty insurer that provides LPI to mortgage lenders and loan servicers throughout the United States.  QBE Specialty Insurance is a direct subsidiary of QBE Insurance Corporation.

32.     As alleged above, QBE Insurance Corporation and QBE Specialty Insurance Company are collectively referred to herein as "QBE Insurance."  QBE FIRST and QBE Insurance are collectively referred to herein as "QBE."

9

V.      SUBSTANTIVE ALLEGATIONS

    A.      Background:  Lender-Placed Insurance and Mortgage Servicing

    33.     Mortgages require borrowers to maintain homeowners insurance to protect the

lender's interest in the secured property.  If a borrower's coverage lapses, the lender is entitled to

purchase LPI, "force place" it, and be reimbursed by the borrower for the cost of the premium.  This

cost becomes additional debt of the borrower subject to the lender's lien.

    34.     All mortgage instruments contain substantively identical terms in this regard.  The

Nungsters' mortgage instrument, for example, provides:

> Property Insurance.  Borrower shall keep the improvements now
> existing or hereafter erected on the Property insured against loss by
> fire, hazards included within the term "extended coverage," and any
> other hazards including, but not limited to, earthquakes and floods,
> for which Lender requires insurance. . . .
>
> ***If Borrower fails to maintain any of the coverages described above,
> Lender may obtain insurance coverage, at Lender's option and
> Borrower's expense***.  Lender is under no obligation to purchase any
> particular type or amount of coverage.  Therefore, such coverage shall
> cover Lender, but might or might not protect Borrower, Borrower's
> equity in the Property, or the contents of the Property, against any
> risk, hazard or liability and might provide greater or lesser coverage
> than was previously in effect. . . . ***Any amounts disbursed by Lender
> under this Section 5 shall become additional debt of Borrower
> secured by this Security Instrument***.  These amounts shall bear
> interest at the Note rate from the date of disbursement and shall be
> payable, with such interest, upon notice from Lender to Borrower
> requesting payment.

(Emphasis added).

    35.     The traditional lending relationship, where the lender makes a loan, retains it in its

portfolio, and services it itself, is today the exception rather than the rule.  Most residential

mortgages in the United States are financed through securitization.

36.     Securitization is a financing method involving the issuance of securities against a dedicated cash flow stream such as mortgage payments.  A financial institution assembles a pool of mortgages which are sold to a special-purpose vehicle ("SPV"), typically a trust, which then issues securities to investors.

37.     For a variety of tax and other reasons, SPVs must be passive.

38.     Loans, however, need to be managed.  Bills must be sent out and payments collected.  Thus, a third party must manage the loans.  That third party is the mortgage loan servicer.  Every loan, irrespective of whether it is securitized, has a servicer.  Servicers are hired by owners of whole loans, typically trustees of mortgage securitization trusts, to perform these management tasks.

39.     Servicers' duties are spelled out in contracts known as Pooling and Servicing Agreements or "PSAs."  One such duty is to make sure that the properties collateralizing the loans are adequately insured.  To fulfill this obligation, the servicer is required to monitor borrowers' homeowners insurance, confirm that it is in-force, demand cure in the event of lapse, and secure LPI if necessary.  This duty is known as "loan tracking."

40.     Another duty of servicers is to administer borrowers' escrow accounts.  Escrow accounts are required by many lenders to ensure timely payment of obligations such as property taxes, premiums for homeowners insurance, and home association dues.  Escrow funds are collected as part of borrowers' monthly payments.  Servicers are required to keep track of the pertinent bills and due dates, and timely remit payment from borrowers' escrow accounts.

41.     Loan tracking and escrow administration are labor intensive functions requiring large operations centers staffed with hundreds of employees.  Servicers frequently outsource these duties to subcontractors.

11

42.     Notably, PSAs treat LPI premium expenses and subcontracting fees differently.  LPI premium expenses are reimbursable to the servicer.  If the borrower defaults, the servicer is entitled to recoup such "advances" from foreclosure proceeds before any remaining funds are passed to the the servicing client, *i.e.*, the securitization trust, GSE, or other owner of the loan.  Subcontracting fees, however, do not count as reimbursable "advances."  Such fees must be paid from the servicer's own funds.

43.     Mortgage servicing is a highly lucrative business.  Servicers receive a fee based on the unpaid principal balance of each trust's mortgage pool or, in some cases, for each loan serviced.  Servicers are also entitled to keep certain borrower-contracted fees such as late charges, assignment transfer fees, insufficient funds bank fees, assumption fees, loss mitigation fees and other incidental fees and charges.  Servicers also benefit from being able to invest and earn interest on borrowers' escrow payments as they are collected until they are paid out to taxing authorities and insurance companies.  Additionally, servicers earn "float" income with respect to borrowers' monthly payments, which are generally collected on the first of the month but not passed to servicing clients until the end of the month.

**B.     WL Ross Acquires AHMSI**

44.     On August 6, 2007, American Home Mortgage Investment Corp. ("AHMIC"), the tenth largest retail mortgage lender in the United States, filed for Chapter 11 bankruptcy protection.  AHMIC's crown jewel was the servicing platform and associated servicing rights of its money-making mortgage loan servicing unit, American Home Mortgage Servicing, Inc., a Maryland corporation ("Old-AHMSI").  AHMIC auctioned off the assets of Old-AHMSI as part of its liquidation.

12

45.     In or about October 2007, WL Ross submitted a stalking horse bid of $435 million to acquire the assets of Old-AHMSI from AHMIC.   The Bankruptcy Court approved the bid, and WL Ross completed the acquisition in or about November 2007.  Specifically, the WL Ross Funds acquired the assets of Old-AHMSI through a Delaware corporation called AH Mortgage Acquisition Co., Inc., which, shortly after such acquisition, was renamed American Home Mortgage Servicing, Inc. (previously defined herein as "AHMSI").

46.     In March 2009, *Forbes* reported that WL Ross's acquisition of AHMSI was part of Ross's strategy "to become a big player in subprime mortgage servicing."

**C.    AHMSI Enters Into a Six-Year Exclusive Arrangement With ZC Sterling**

47.     Prior to its acquisition by WL Ross, AHMSI had obtained its LPI from Assurant Inc. ("Assurant"), a top provider of property-casualty insurance.  AHMSI had also outsourced its loan tracking and escrow administration duties to a subcontractor affiliated with Assurant.

48.     WL Ross, however, was not satisfied with AHMSI's financial arrangement with Assurant, and, in or about the spring of 2008, caused AHMSI to issue a request for proposal for both LPI and tracking and escrow administration services to ZC Sterling, then a major competitor of Assurant and an emerging player in the United States LPI industry.

49.     Fortuitously, at the time that it received AHMSI's proposal request, ZC Sterling was in negotiations to be acquired by QBE Insurance Group, the eighteenth largest insurance company in the world.  ZC Sterling knew that, if it were able to secure a major independent loan servicer such as AHMSI as a client, it would significantly expand ZC Sterling's book of business, enhance ZC Sterling's attractiveness as an acquisition candidate, and increase the consideration that QBE

13

Insurance Group might be willing to pay in the contemplated acquisition.  Accordingly, ZC Sterling had a strong incentive, and was highly motivated, to win AHMSI's business.

50.     ZC Sterling thus submitted a highly attractive LPI proposal to AHMSI.  Specifically, ZC Sterling offered to give AHMSI tens of millions of dollars in secret premium rebates, *i.e.*, kickbacks, in exchange for a multi-year contract as AHMSI's exclusive LPI insurer and tracking and escrow administration subcontractor.

51.     ZC Sterling was not itself an insurer, but proposed to obtain the LPI from its affiliate Empire Fire and Marine Insurance Company ("Empire"), for which ZC Sterling supposedly served as "managing general agent."  According to ZC Sterling's proposal, Empire would collect the LPI premiums from AHMSI, then, through ZC Sterling, funnel a substantial portion thereof back to AHMSI in secret premium rebates, *i.e.*, kickbacks.  ZC Sterling even agreed to pay tens of millions of dollars of premium rebates in advance, before any LPI premiums were paid, on the basis of ZC Sterling's expectation that, over the course of the proposed multi-year contract, AHMSI would pay hundreds of millions of dollars in LPI premiums, and that, accordingly, the deal would be immensely profitable for ZC Sterling and Empire.

52.     ZC Sterling also offered to help AHMSI conceal the premium rebates from AHMSI's borrowers, servicing clients, and regulators.  Specifically, ZC Sterling offered to launder the rebates through multiple sham and collusive transactions involving affiliates and related parties.  That way, Defendants could pretend that no rebates existed and charge borrowers for indemnification based on the full purported price of the premiums, *i.e.*, materially in excess of Homeward's true expense.  To the extent borrowers defaulted, the overstated LPI charges could then simply be shifted to AHMSI's

14

servicing clients, who, as alleged above, were obligated to reimburse AHMSI for any LPI charges not recouped from borrowers.

53.     To be sure, the scheme would result in AHMSI's borrowers and servicing clients being overcharged.  From ZC Sterling's and AHMSI's point of view, however, those victims would be none the wiser, and, regardless, had no recourse.  After all, borrowers had agreed to indemnify AHMSI for any LPI premium expenses, and had no right to audit AHMSI for compliance with the terms of their mortgages.  As for AHMSI's servicing clients, *i.e.*, the securitization trusts that owned the loans, they had no motive to complain because they were mere pass-through entities and not the real parties in interest.  Those suffering the economic loss were the investors who purchased the securities issued by the securitization trusts, or, in the case of mortgages owned or guaranteed by the GSEs, the taxpayers, neither of whom had legal standing to complain.

54.     Hoping to retain AHMSI's business, Assurant submitted a competing bid to AHMSI. The terms offered by ZC Sterling, however, were far superior to those offered by Assurant.

55.     Accordingly, in or about August 2008, AHMSI accepted ZC Sterling's proposal and awarded it a six-year contract as AHMSI's exclusive loan tracking and escrow administration subcontractor (the "Subcontracting Agreement").  A key term of the Subcontracting Agreement obligated AHMSI to purchase all of its LPI from ZC Sterling's affiliate, Empire.

**D.      QBE Insurance Group Acquires ZC Sterling**

56.     In November 2008, QBE Insurance Group reached an agreement to acquire ZC Sterling for $575 million.  The transaction was completed in December 2008.  Thereupon, ZC Sterling was renamed Sterling National Corporation.  *See* Exhibit A.

57.     Despite the change in ZC Sterling's ownership and name, the Subcontracting Agreement with Homeward remained in force.  The only modification was that QBE Insurance succeeded to the rights of Empire as AHMSI's exclusive LPI insurer.

58.     In 2011, Sterling National Corporation was renamed QBE FIRST.

59.     In or about February 2012, AHMSI was renamed Homeward.

**E.     The Sham and Collusive Rebate Transactions**

60.     QBE paid Homeward an estimated $125 million in premium rebates during the course of the Class Period, camouflaged and concealed through multiple sham and collusive transactions involving affiliates and related parties.  Those transactions included the following:

**1.     $10 Million as Purported Compensation Under a Bogus "Marketing Services" Agreement**

61.     Concurrent with the execution of the Subcontracting Agreement, QBE FIRST (then known as ZC Sterling) paid Homeward (then known as AHMSI) $10 million as purported compensation under a supposedly separate "marketing services agreement."

62.     The "marketing services agreement," however, was a sham, and lacked economic substance.  No such services existed or were contemplated by the parties.  Instead, the $10 million simply constituted a disguised premium rebate.

63.     Such facts are confirmed by sworn testimony.  In May 2012, the DFS publicly examined representatives of Homeward and QBE as part of an investigation of the LPI industry.  Testifying on May 21, 2012, Homeward executive vice president Steven M. Massey ("Massey") admitted that Homeward never provided QBE with any "marketing services" or intended to.  Rather, Homeward's only purported obligation under the supposed "marketing services agreement" was to

give QBE "a reference" if asked, which it never was.  As Massey essentially admitted, the $10 million simply constituted part of a lucrative "financial arrangement" offered by QBE to win Homeward's business.  It had nothing to do with "marketing."

64.     Examined on May 17, 2012, QBE executive Matthew Freeman ("Freeman") corroborated Massey's testimony.  Freeman could not identify any valid business rationale for the $10 million payment, and said he was "unaware of a similar situation to compare it to."

65.     The idea that the $10 million truly constituted compensation for "marketing services" – as opposed to a laundered premium rebate – was ludicrous.  Homeward was in the loan servicing business, not the "marketing" business.  Homeward had no ability or competency to conduct "marketing."

66.     Furthermore, at all relevant times, Homeward considered its relationship with QBE to be highly confidential.  Indeed, responding to a DFS subpoena in 2012, Homeward designated all documents relating to its dealings with  QBE as "confidential trade secrets."  Homeward and QBE subsequently blocked the disclosure of such documents under New York's Freedom of Information Law to Plaintiffs' counsel.  In light of the avowed secrecy relating to Homeward's relationship with QBE, it is implausible that the $10 million payment had anything to do with "marketing."

### 2.     Warrants Worth $85 Million Awarded to Homeward's Shareholders

67.     Also concurrent with the execution of the Subcontracting Agreement, QBE FIRST (then known as ZC Sterling) issued warrants to Homeward (then known as AHMSI)'s shareholders, *i.e.*, WL Ross.  The warrants entitled WL Ross to ownership of 15% of ZC Sterling's common shares.

68.     The issuance of the warrants to WL Ross was devoid of any legitimate business purpose, but constituted a secret premium rebate and blatant kickback.  In exchange for the warrants,

WL Ross agreed to cause AHMSI, which WL Ross controlled, to award the proposed six-year exclusive contract to ZC Sterling.

69.     Notably, all parties to the warrants transaction kept its existence secret until May 2012, when, under cross-examination by the DFS, representatives of QBE and Homeward were forced to admit the relevant facts publicly.

70.     WL Ross struck the bargain to receive the warrants because it learned in the course of its negotiations with ZC Sterling that ZC Sterling simultaneously was in negotiations with QBE Insurance Group with respect to a potential acquisition.  WL Ross knew that, if the contemplated acquisition occurred, the warrants could be worth tens of millions of dollars.  WL Ross thus seized upon this opportunity to obtain a valuable kickback.

71.     In December 2008, four months after WL Ross received the warrants, QBE Insurance Group completed the acquisition of ZC Sterling for $575 million.  Upon such completion, WL Ross converted the warrants to $85 million cash – an unearned windfall.

### 3.     More Than $16 Million in Phony "Insurance Commissions"

72.     QBE Insurance also funneled premium rebates to Homeward under the guise of paying "commissions" to a purported third-party insurance agent, AIA.  The "commissions" constituted 15% of Homeward's LPI premiums, and totaled at least $16 million during the Class Period.

73.     AIA, however, was not a *bona fide* insurance agent or a third party.  Instead, AIA was a direct and wholly-owned subsidiary of Homeward that Homeward had formed in or about the spring of 2008 for the sole purpose of laundering secret premium rebates disguised as "insurance commissions" from QBE.

18

74.     At all relevant times, AIA's existence was limited to a set of incorporation documents and a series of book-keeping entries maintained by Homeward.  AIA had no offices, employees, or operations independent of Homeward; never sold, or solicited the sale of, any insurance product to any insured, including to Homeward; and never engaged in any business activities apart from carrying on the affairs of its parent, Homeward.  Any activities of AIA were conducted by full-time employees of Homeward purportedly hired by AIA as "independent contractors."

75.     AIA's sole purpose and function was to collect "commissions" from QBE and upstream them to Homeward.  AIA paid the money to Homeward under the guise of compensating Homeward for the purported use of its "office space."

76.     AIA's purported obligation to pay Homeward for "office space" supposedly arose under an ostensible "Office Services Agreement" between Homeward and AIA.  The "Office Services Agreement," however, was collusive and fraudulent, serving simply as a pretext to launder the premium rebates disguised as "insurance commissions."   Having no employees or activities independent of Homeward, AIA did not occupy any "office space."

77.     Highlighting the collusiveness of the purported "Office Services Agreement," Homeward's president and Chief Executive Officer, David M. Friedman, signed the instrument on behalf of both parties – Homeward and AIA.  Furthermore, the agreement provided that any formal notices to be issued by either party thereunder, Homeward or AIA, were to be sent to the same corporate officer – an employee of Homeward who absurdly would have posted any notices to himself.

### 4.    Approximately $25 Million in Below-Cost Services

78.    As alleged above, QBE FIRST subcontracted to perform Homeward's loan tracking and escrow administration duties.

79.    Notably, however, Homeward paid QBE FIRST only nominal consideration for this labor intensive work – specifically, $0.08 per loan, per month, an amount that was substantially below cost.

80.    QBE FIRST secretly derived its actual compensation under the Subcontracting Agreement from QBE Insurance.  In particular, QBE Insurance paid QBE FIRST for the services provided to Homeward by funneling QBE FIRST money – *i.e.*, premium rebates – derived from Homeward's LPI premiums.  The money was transmitted through inter-affiliate transfers.  Homeward thereby obtained below-cost loan tracking and escrow administration services via laundered LPI premium rebates.

81.    These financial arrangements are confirmed by sworn testimony.  On May 17, 2012, QBE executive Matthew Freeman admitted in sworn testimony to the DFS that QBE Insurance routinely compensated QBE FIRST for delivering free or below-cost, outsourced loan tracking and escrow administration services to QBE Insurance clients such as Homeward.  In fact, as Freeman conceded, "QBE Insurance's principal expenses are the compensation it pays QBE FIRST and the payment of claims under the policies it writes."

82.    It is estimated that QBE supplied Homeward with in excess of $25 million worth of below-cost services by virtue of these transactions during the Class Period.

**F.    The Scheme Defrauded Plaintiffs and the Class**

83.    As a result of the scheme alleged herein, Defendants overstated Homeward's LPI premium expenses and thereby recouped inflated amounts from borrowers in indemnification under their mortgages.  Under the mortgages, Homeward had no right to be indemnified for more than it actually spent for the LPI. Defendants thus should have subtracted the rebates, which materially reduced Homeward's costs, from the amounts that borrowers were billed.  Instead, Defendants fraudulently charged borrowers based on the full purported price of the premiums, *i.e.*, materially in excess of Homeward's true costs.  This enabled Homeward to keep the rebates for itself.

84.    Notably, borrowers have no say in the selection of servicer.  All mortgage loan agreements provide in words or substance that:

> The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower.  A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law.  There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note.

85.    Accordingly, no mechanism exists for borrowers to select servicers that do not receive kickbacks from LPI insurers.  Borrowers cannot opt-out with respect to the kickbacks or collusive transactions described herein.

86.    Additionally, once a borrower experiences a lapse in his homeowners insurance, he has no choice but to pay whatever LPI charges are imposed, even if, as here, those charges are fraudulently overstated.  The payment of such charges is not an election, but coerced through threat of economic loss.  Specifically, as alleged above, whatever LPI charges are imposed "become

additional debt of Borrower" secured by the lender's lien.  Borrowers risk foreclosure if they fail to reimburse their servicer for the claimed costs of LPI.

87.     Moreover, servicers simply appropriate whatever amounts they claim for LPI from borrowers' loan payments.  Due to the threat and fear of foreclosure, borrowers are compelled to make their loan payments – and, hence, to pay any LPI charges incorporated into their monthly bills.  Furthermore, borrowers have no right to audit their servicers' underlying transactions and, thus, to learn whether their servicer is engaging in fraud.

88.     Nothing herein challenges or should be construed as challenging the reasonableness of any insurance rates filed with or approved by state regulators.  Plaintiffs only challenge fraudulently overstated charges under their mortgages.  Whatever the approved rates, nothing in the mortgages entitled Homeward to recoup from borrowers more than it actually spent for LPI.

89.     Notably, at all relevant times, Homeward was the exclusive policyholder of the LPI policies in question.  As such, Homeward and only Homeward had the right and authority to act in matters pertaining to the policies, and the sole obligation to pay the premiums.  Borrowers had no such rights or obligations.  Instead, the rights and obligations of borrowers were defined by the four corners of their mortgage instruments.  Those instruments were not filed with or approved by – or even subject to the jurisdiction of – state insurance regulators.

**G.     The Scheme Defrauded Homeward's Servicing Clients**

90.     As alleged above, this action is brought on behalf of a putative class of defrauded borrowers.  Defendants' scheme, however, also victimized Homeward's servicing clients, *i.e.*, the GSEs, private securitization trusts, and other owners of whole loans that engaged Homeward to

administer borrowers' loans.  The fraud committed by Defendants against Homeward's servicing clients forms part of the "pattern of racketeering activity" alleged in this RICO lawsuit.

91.     As alleged above, Homeward's servicing clients were obligated to reimburse Homeward for any LPI premium expenses not recouped from  borrowers.  Such amounts constituted "advances" payable from foreclosure proceeds before remaining sums were passed to the servicing client.  To the extent borrowers defaulted, the servicing clients thus bore the inflated LPI bills in the form of reduced loan proceeds and higher loss severities.

92.     The Homeward servicing clients victimized are believed to have included Fannie Mae and Freddie Mac, which have received hundreds of millions of dollars in government bailouts and are still under conservatorship.  Many of the overcharges alleged herein thus ultimately have been paid for by United States taxpayers.

**H.     Servicers Profit from Abusive Activities**

93.     A number of commentators, including Professor Adam Levitin of Georgetown University Law Center ("Professor Levitin"), have observed that loan servicers' compensation structure creates serious principal-agent conflicts between loan servicers and their servicing clients. Servicers have no stake in the performance of mortgage loans and do not share their servicing clients' interest in maximizing the value of the loans.  Rather, the interest of servicers is in maximizing whatever fee and expense charges they can recoup.

94.     This compensation structure incentivizes servicers to artificially and improperly inflate their fees and expenses.  As a consequence, servicers frequently charge so-called "junk fees" either for unnecessary work or work that was never done.  Servicers also engage in a variety of abusive practices, including by force-placing LPI when not required, or, as in this case, by failing to credit LPI

23

rebates to borrowers and servicing clients. *See generally* Adam Levitin & Tara Twomey, *Mortgage Servicing*, 28 Yale J. on Reg. 1, 76 (2010); *Robo-Signing, Chain of Title, Loss Mitigation, and Other Issues in Mortgage Servicing: Hearing Before the Subcommittee on Housing and Community Opportunity of the House Financial Services Committee*, 111th Cong., Nov. 18, 2010 (Statement of Associate Professor Adam J. Levitin, Georgetown Univ. L. Center).

95.    Servicers' compensation structures also incentivize them to delay foreclosures. Delaying foreclosures keeps homeowners in a "sweatbox" of mounting servicer fees and expenses, according to Professor Levitin.  Through this strategy, servicers disregard their contractual duty to maximize the value of defaulted loans through prompt liquidation, and, instead, simply keep ramping up the charges until the loan hits the "sweet spot" where the amount owed to the servicer is equal to the liquidation value.  At that point, because there is no equity left, the servicer just "want[s] to dump the property from [the] portfolio as quickly as they can," Professor Levitin observes.  Servicers thus routinely drag out defaults for the purpose of piling up bogus and overstated fees and expenses until the equity is fully depleted, leaving nothing for the borrower or the servicing client.

96.    Abusive servicer activities such as delayed foreclosures, "junk" fees, and overstated LPI charges have enabled servicers to strip billions of dollars in equity from borrowers' homes at the expense of homeowners and mortgage investors.  These activities also exacerbated the housing crisis by pushing marginal borrowers prematurely or unnecessarily into foreclosure.  As Professor Levitin has stated, the costs of these kinds of servicer abuses have been "externalized directly on homeowners and indirectly on communities and the housing market as a whole."

## V.    DEFENDANTS' FRAUDULENT MAIL AND WIRE COMMUNICATIONS

97.    Throughout the Class Period, Defendants issued mail and wire communications to borrowers and servicing clients incident to and in furtherance of the scheme.

98.    Homeward issued monthly statements and bills to borrowers.

99.    QBE FIRST, acting in its capacity as Homeward's loan tracking subcontractor, issued notices to borrowers warning them that LPI would be placed and alerting them whenever LPI was placed, renewed, or cancelled.  The QBE FIRST notices purported to be from Homeward, and were on Homeward letterhead.  Nevertheless, QBE FIRST prepared and issued the notices itself.

100.    The mail and wire communications to borrowers were reasonably calculated to deceive persons of ordinary prudence and comprehension, were materially false and misleading, and omitted material information necessary to make the information that was disclosed not misleading. The communications incorporated the overstated LPI charges, omitted disclosure of the rebates, and suggested that borrowers were obligated to pay the full inflated amounts.

101.    For example, on October 7, 2010, QBE FIRST issued a notice to the Parkers claiming that Homeward had "advanced" $826.51 for LPI on their home and was entitled to recover that purported "cost" from the Parkers under their mortgage.  "The premium cost of this insurance is shown on the attached policy declaration.  You are solely responsible for the repayment of this cost," the notice said. QBE FIRST issued a similar notice to the Nungsters on April 20, 2012.

102.    These statements were false.  In fact, the LPI had "cost" Homeward materially less than the amounts indicated in the notices in light of the secret rebates that Homeward had received. Because of those rebates, the policy declarations issued to borrowers overstated the sums that

Homeward had "advanced."  Moreover, borrowers were not "responsible" for the amounts indicated in the notices because Homeward had no right to be "repaid" more than it had actually spent for LPI.

103.    Defendants intended to mislead borrowers.  Defendants purposely crafted the communications to foster the appearance that the LPI charges indicated in the communications were properly calculated and actually owed.  The communications concealed the fraud and lulled borrowers into a false sense of security that nothing was amiss.  Defendants sought to make it less likely that borrowers would object to the charges, complain to authorities, or bring lawsuits.

104.    Homeward and QBE FIRST also issued communications to Homeward's servicing clients.  Homeward issued servicing clients periodic remittance and servicing reports.  QBE FIRST, acting in its capacity as Homeward's loan tracking subcontractor, issued servicing clients periodic attestations of compliance with servicing criteria.

105.    Like the communications to borrowers, those to Homeward's servicing clients were reasonably calculated to deceive persons of ordinary prudence and comprehension, were materially false and misleading, and omitted material information necessary to make the information that was disclosed not misleading.  The communications included the overstated LPI charges as "servicing advances," omitted disclosure of the rebates, and attested that Homeward and QBE FIRST were in compliance with the PSAs.

106.    These statements were false.  In fact, Homeward's "advances" were inflated in light of the secret premium rebates that Homeward had received.  Additionally, Homeward and QBE FIRST were not in compliance with the PSAs.  Instead, Homeward and QBE FIRST were breaching the PSAs not only by overstating Homeward's "advances," but also by obtaining reimbursement for subcontracting fees.  As alleged above, unlike LPI premium expenses, subcontracting fees were not

reimbursable under Homeward's PSAs.   Nevertheless, QBE Insurance paid QBE FIRST's subcontracting fees from money derived from Homeward's LPI premiums, which were reimbursable. In effect, Homeward was overstating a reimbursable expense and using the the excess funds thereby recouped to cover the costs of a non-reimbursable expense.

107.    Defendants intended to mislead Homeward's servicing clients.  Defendants purposely crafted the communications to foster the appearance that Homeward's "advances" were properly calculated in compliance with the PSAs.  The communications concealed the fraud and lulled Homeward's servicing clients into a false sense of security that nothing was amiss.  Defendants sought to make it less likely that servicing clients would object to the overstated advances, complain to authorities, bring lawsuits, or exercise any right to audit Homeward's transactions.

## VI.    NEW YORK STATE'S INVESTIGATION OF THE LPI INDUSTRY

### A.    Superintendent Lawsky Launches an Investigation

108.    On or about January 10, 2012, Benjamin Lawsky, the Superintendent of the DFS ("Superintendent Lawsky"), launched a probe of improper practices in the LPI industry.

109.    On April 5, 2012, Superintendent Lawsky issued a press release announcing that the DFS  had expanded its LPI probe and was scheduling public hearings on the matter to take place in May 2012.

110.    The press release stated that the DFS's investigation had already uncovered evidence that borrowers had been overcharged for LPI "due [to] relationships between and payments by insurers to banks and their affiliates.  .  .  .  Insurers pay high commissions to the banks or their affiliates presumably to guarantee the insurers will receive business."  The press release referred to the fact that LPI overcharges harm not only borrowers but also "investors in mortgages or

27

mortgage-backed securities, because servicers advance the insurance payments and then recoup those payments out of investment income before investors are paid."

**B.      QBE and Homeward Admit to the Essential Facts Regarding the Premium Rebates**

111.    In May 2012, the DFS held three days of hearings.  As alleged above, executives of Homeward (then known as AHMSI) and QBE testified.  Specifically, Massey testified on behalf of Homeward, and Freeman testified on behalf of QBE.  Massey and Freeman admitted to the essential facts regarding the premium rebates and overcharges alleged herein.

112.    Testifying on May 21, 2012, Massey admitted that, in August 2008, Homeward (then known as AHMSI) had awarded the six-year contract to QBE (then known as ZC Sterling) because of the superior package of "financial arrangements," *i.e.*, secret premium rebates, that QBE had offered compared to its competitor, Assurant.  Massey acknowledged that those "arrangements" included the $10 million supposed "marketing support payment," the warrants to WL Ross, the $16 million in bogus "insurance commissions," and the below-cost services.

113.    Specifically, Massey admitted that Homeward never provided QBE with any "marketing services" or intended to.  Rather, Homeward's only purported obligation under the supposed "marketing agreement" was to give QBE "a reference" if asked, which it never was.  As Massey essentially admitted, the $10 million simply constituted part of the lucrative "financial arrangement" offered by QBE to win Homeward's business.  Massey also admitted that AIA collected the "commissions" from QBE and then transferred them to Homeward, purportedly to compensate Homeward for the ostensible use of its "office space."

28

114.    Massey also admitted that QBE FIRST only charged Homeward the artificially low cost of $0.08 per loan, per month, for its subcontracting services, notwithstanding that those services were "expensive."  "It's a very arduous process to go through the tracking, . . . to keep tabs on all these loans and the process, checking, auditing, funding.  It is an expensive endeavor," Massey stated.

115.    Asked by the commissioners how Homeward (then known as AHMSI) secured such remunerative terms from QBE (then known as ZC Sterling), Massey testified that he believed that, at the time, *i.e.*, in August 2008, ZC Sterling considered AHMSI to be "a fairly significant client" and "would have liked to expand in the business.  And I think they recognize that having us as a client would help them," *i.e*., in ZC Sterling's negotiations to be acquired by QBE Insurance Group.

116.    Testifying on May 17, 2012, QBE's Freeman similarly admitted to the $10 million supposed "marketing" payment and the $16 million in ostensible "commissions."  Freeman also conceded that QBE Insurance funneled money to QBE FIRST to "compensate" it for the loan tracking and escrow administration services provided to Homeward.  "QBE Insurance's principal expenses are the compensation it pays QBE FIRST and the payment of claims under the policies it writes," Freeman stated.

### C.    QBE Pays New York $10 Million to Settle LPI-Related Claims

117.    On April 17, 2013, QBE entered into a Consent Order with New York in connection with its LPI activities in the State.  QBE agreed to pay $10 million in penalties and to implement a set of "major reforms" relating to its practices.  QBE pledged, subject to certain conditions, to stop: (i) paying purported "insurance commissions" to the affiliates of loan servicers; (ii) providing "free or below-cost, outsourced services to banks, servicers or their affiliates;" and (iii) "making payments"

to servicers or their affiliates "in connection with securing business."  In other words, QBE agreed

to stop engaging in the precise misconduct alleged in this complaint.

118.    Governor Andrew Cuomo lauded the settlement as saving homeowners, taxpayers, and

investors millions of dollars going forward with lower rates.  "The kickbacks and payoffs in the

force-placed insurance industry used to be a dirty little secret that pushed far too many families off

the foreclosure cliff, but my Administration's investigation is helping put a stop to those abuses," said

Governor Cuomo. "The nation-leading reforms that we're putting in place will mean lower home

insurance costs and better protections for many working New Yorkers."

## VII.    FANNIE MAE UNSUCCESSFULLY ATTEMPTS TO PUT AN END TO THE OVERCHARGES

119.    Fannie Mae is the largest single owner and guarantor of mortgage loans in the United

States.  Fannie Mae has contracted with more than 1,400 mortgage loan servicers across the United

States to service tens of millions of mortgage loans on Fannie Mae's behalf.  At all relevant times,

Homeward was an approved servicer for Fannie Mae in good standing.  Homeward's servicing

portfolio is believed to have included a large percentage of Fannie Mae loans.  With respect to those

loans, Fannie Mae was obligated to reimburse Homeward for any LPI premium expenses not

recouped from borrowers.

### A.    Fannie Mae Seeks Independent, Kickback-Free Bids for LPI and Tracking Services

120.    On March 6, 2012, Fannie Mae issued a request for proposal (the "RFP") seeking to

completely revamp the LPI procurement process.  "Much of the current Lender Placed Insurance cost

borne by Fannie Mae results from an incentive arrangement between Lender Placed Insurers and

Servicers that disadvantages Fannie Mae and the homeowner," the RFP stated. "This RFP is designed to change this situation."

121.    Specifically, the RFP requested that insurers submit independent and not combined bids for LPI and tracking and administration services.  Approved applicants were to be put on lists of "Preferred Providers" from which servicers of Fannie Mae loans would be required to choose.

122.    According to the RFP, Fannie Mae had conducted a "review" from which it had learned that LPI insurers paid "commissions/fees to Servicers for placing business with them" and, further, that such "commissions/fees" were "recovered in part or in whole by the Lender Placed Insurer from the premiums, which the Servicers pass on to Fannie Mae."

123.    Fannie Mae additionally stated that it had discovered that "Fannie Mae is often paying twice for Insurance Tracking services; once via the servicing fee that Fannie Mae pays to Servicers, and again via the Lender Placed Insurance premiums, since those premiums may include or subsidize the costs of tracking services."

124.    The RFP proposed a "new business model," one that would eliminate such secret rebates.  Fannie Mae explained that the objective of the RFP was to eliminate the "existing system" of secret rebates involving "subsidized" tracking and administration services and related-party "commissions."  The RFP stated:

> As a best practice Fannie Mae seeks to reduce expenses while improving service quality.  After extensive internal review, Fannie Mae believes that current Lender Placed Insurance costs are not market competitive and can be improved through unit price reductions and fee transparency to the benefit of both the taxpayers and homeowners. Therefore, Fannie Mae is undertaking this competitive procurement process to improve the pricing and fee transparency for Lender Placed Insurance while maintaining coverage and service quality.

**Current Situation**

Fannie Mae's current Lender Placed Insurance situation is as follows:

1.  Homeowners are required to maintain voluntary hazard insurance on Fannie Mae insured properties.

2.  Lender Placed Insurance must be acquired by mortgage Servicers when a property is no longer eligible for Voluntary Insurance, or when the Servicer cannot obtain proof of adequate Voluntary Insurance from the homeowner, irrespective of whether or not that homeowner is current or delinquent on the loan.

3.  The cost of Lender Placed Insurance is higher than the cost of voluntary hazard insurance. Homeowners are billed for the Lender Placed Insurance premiums. *However, if the homeowner does not pay the premium (for example, if the property has already been vacated), then Servicers pass on the premium costs to Fannie Mae.*

4.  *Servicers are responsible for providing tracking services, per Fannie Mae Guidelines. Many large Servicers have chosen to outsource the Insurance Tracking and associated administrative process to third parties, the largest of which are affiliated with Lender Placed Insurers.*

5.  *Lender Placed insurers often pay commissions/fees to Servicers for placing business with them. The cost of such commissions/fees is recovered in part or in whole by the Lender Placed Insurer from the premiums, which the Servicers pass on to Fannie Mae.*

6.  The existing system may encourage Servicers to purchase Lender Placed Insurance from Providers that pay high commissions/fees to the Servicers and provide tracking, rather than those that offer the best pricing and terms to Fannie Mae. Thus, the Lender Placed Insurers and Servicers have little incentive to hold premium costs down. *In addition, Fannie Mae is often paying twice for Insurance Tracking services; once via the servicing fee that Fannie Mae pays to Servicers, and again via the Lender Placed Insurance premiums, since those premiums may include or subsidize the costs of*

32

*tracking services (to the extent that insurers are providing such services)*.

In appropriate circumstances, Lender Placed Insurance is necessary and important to the preservation of Fannie Mae assets. *However, much of the current Lender Placed Insurance cost borne by Fannie Mae results from an incentive arrangement between Lender Placed Insurers and Servicers that disadvantages Fannie Mae and the homeowner. This RFP is designed to change this situation*.

**Expected Outcome**

The expected outcome of this procurement is for Servicers and Fannie Mae to obtain competitively-priced Lender Placed Insurance that incorporates price transparency and collaboration with Lender Placed Insurers. Fannie Mae expects to achieve the following:

1. *Eliminate the ability of Servicers to pass on the cost of commissions/fees to Fannie Mae*.

2. *Eliminate the ability of Servicers to pass on the cost of Insurance Tracking services to Fannie Mae, since the cost for such services is reimbursed to the Servicer in the form of current servicing fees*.

3. *Separate the commissions and fees for Insurance Tracking services from the fees for Lender Placed Insurance to ensure transparency and accountability.*

4. Require Servicers to order Lender Placed Insurance policies based on competitive pricing negotiated by Fannie Mae; Fannie Mae will choose one or more Providers based on the responses received during the RFP process. The chosen Providers will be placed on a Preferred Provider List.

5. Restructure the business model to align Servicer incentives with the best interests of Fannie Mae and homeowners.

6. Enforce best practices that encourage the use of voluntary insurance and reduce the demand for lender placed insurance.

Fannie Mae recognizes that the current system developed over a period of years. However, Fannie Mae is prepared to restructure the current Lender Placed Insurance business model to operate as a market driven

33

service that efficiently meets the best interests of Fannie Mae, its partner insurers, taxpayers, and homeowners.

*Fannie Mae is confident that the business model proposed herein is fair to all parties, allows market-based pricing, eliminates subsidies, and allows Fannie Mae to best meet its federal charter to facilitate home ownership, provide liquidity to the housing market, and protect taxpayers*. Fannie Mae also believes that this new model is sustainable over time and robust enough to adjust to changing conditions as the housing market recovers. The attributes of the new business model will be as follows:

1.   The premiums to be charged for Lender Placed Insurance will be negotiated between Fannie Mae and the Lender Placed Insurer(s). These premiums will be communicated to Fannie Mae's Servicer community.

2.   The Lender Placed Insurer(s) will continue to invoice the Servicers for insurance provided. Fannie Mae will then reimburse the Servicers, but will not pay more than the rate negotiated by Fannie Mae. *The rate negotiated between Fannie Mae and the Lender Placed Insurer(s) will exclude any commissions paid by the Lender Placed Insurer(s) to Fannie Mae Servicers to place their insurance on Fannie Mae properties. In addition the rate will exclude the cost of providing Insurance Tracking services or any other costs beyond the cost of the policy premium to the Servicer*.

3.   Servicers may contract for Insurance Tracking and associated administrative services from a Lender Placed Insurer on the Preferred Provider List, perform tracking services in-house, or outsource tracking to a Provider not on the list since the Servicer is fully liable for tracking costs. *However, the full cost of such services must be billed independent of, and never embedded in, the insurance premiums charged for Lender Placed Insurance. Fannie Mae will not reimburse Servicers for these tracking and administrative services*.

(Emphasis added).

125.   By virtue of the RFP, Fannie Mae hoped to "lower costs for homeowners, taxpayers, and Fannie Mae."

**B.      The LPI Industry Lobbies the FHFA to "Spike" the Fannie Mae RFP**

126.    Multiple bidders, including, reportedly, QBE and Assurant, responded to the Fannie

Mae RFP.  An analysis of the bids leaked to *American Banker* in late 2012 indicated that Fannie Mae

stood to save approximately 29% off its LPI costs, or $145 million annually based on the bids.

127.    In September 2012, Fannie Mae asked the Federal Housing Finance Administration

(the "FHFA"), Fannie Mae's conservator, to sign off on the new procurement plan.

128.    The FHFA, however, refused.

129.    The LPI industry stood to lose tremendous profits as a result of the Fannie Mae RFP,

which would have barred the lucrative kickbacks that had become the industry's lifeblood.  Thus, loan

servicers and LPI insurers (including QBE), even as they responded to the RFP, had mounted an

aggressive, behind-the-scenes lobbying campaign to pressure the FHFA into vetoing the Fannie Mae

initiative.

130.    The lobbying succeeded.  On February 8, 2012, to the surprise of Fannie Mae staffers,

the FHFA informed Fannie Mae that it was not approving the RFP, according to accounts by

*American Banker*, which covered these developments in a series of investigative reports.

131.    The following day, the FHFA held a private conference call with the Mortgage

Bankers Association and other trade groups to inform them of the decision.  The industry participants

were extremely pleased.  Defeating the Fannie Mae plan, thereby enabling the exploitative status quo

to continue, had been a top business priority. Victory was now achieved.

132.    Immediately after the call and before the FHFA publicly released any information, the

stock price of Assurant, one of the largest LPI providers in the United States, surged by 6.7%.

35

133.   As summarized by *American Banker*, the FHFA "buckled under pressure from insurers and bankers" and "spiked" the Fannie Mae plan, thus allowing the system of secret rebates to continue at a cost of hundreds of millions of dollars a year to homeowners and mortgage investors.  *See* Jeff Horwitz, "Big Banks Win, Taxpayers Lose as Fannie Insurance Overhaul Spiked," *American Banker*, Feb. 25, 2013.

134.   The columnist Felix Salmon of *Reuters* ("Salmon") issued a blistering column criticizing the FHFA's action.  Salmon stated that the FHFA's stance on the Fannie Mae RFP had proven that it was "captured" by banking interests which were "extracting rents" from homeowners, mortgage investors and taxpayers.  Salmon argued that the FHFA was "useless," "obstructive," "counterproductive," and should be "abolished."  As Salmon wrote:

> *Fannie has seen at least $150 million of savings evaporate – and homeowners are going to wind up overpaying even more, for insurance their servicers have chosen for them*.

> \*       \*       \*

> *I've heard of regulators being captured by the organizations they're supposed to be regulating – that happens all too frequently. But the situation at the FHFA seems to be even worse: it looks as though it has been captured by the banks which are extracting rents from the regulated organizations*.

> Indeed, it's hard to think of a single good reason why the FHFA should exist at all. . . .   The FHFA has been *useless* and *obstructive* pretty much from day one, and this latest decision only serves to underscore how *counterproductive* it's being.

Felix Salmon, "It's Time to Abolish the FHFA," *Reuters*, Feb. 26, 2013 (emphasis added).

### C.   The OIG of the FHFA Recommends that Fannie Mae Consider Suing QBE

135.   On June 25, 2014, the Office of the Inspector General (the "OIG") of the FHFA issued a report recommending that Fannie Mae and Freddie Mac consider suing QBE and other actors in the

LPI industry for practices similar to those alleged here.  By the OIG's calculations, Fannie Mae and Freddie Mac suffered an estimated $158 million in financial harm from improperly overstated LPI charges in 2012 alone.

## VIII.   WL ROSS'S DOMINATION AND CONTROL OF HOMEWARD

136.    At all relevant times, WL Ross dominated and controlled the affairs of its portfolio company, Homeward, such that the circumstances justify piercing Homeward's corporate veil and holding WL Ross legally responsible for Homeward's unlawful conduct.  WL Ross operated Homeward as a mere instrumentality, alter-ego, and agent of WL Ross.  WL Ross exercised and wielded its dominion and control over Homeward to cause Homeward to engage in the specific unlawful acts alleged in this complaint, thereby abusing Homeward's corporate form to perpetrate an injustice against Plaintiffs and the Class.

137.    In an interview with the *Wall Street Journal* in February 2009, Ross acknowledged that "[t]he whole idea of private equity is to exercise control."  The notion that private equity firms "should be passive investors doesn't strike me as sensible," Ross said.  Similarly, in a January 6, 2009 interview with *CNNMoney*, Ross stated, "Private equity is not passive.  We are not minority investors. We are control investors.  That is the whole theory of private equity – adding value through better management."

138.    Consistent with Ross's philosophy, WL Ross's limited partnership agreements and private placement memoranda with its investors emphasized that WL Ross was actively involved in the management and operation of the companies in which WL Ross invested.

139.    Also consistent with this philosophy, WL Ross exercised complete control over Homeward at all times during the Class Period.  On April 26, 2009, the *Wall Street Journal* accurately reported that Homeward was "controlled by Mr. Ross."

140.    WL Ross appointed a majority, if not all, members of Homeward's board of directors, and appointed and named individuals associated with and/or hand-picked by WL Ross to key management, executive, and operational roles at Homeward.  At all times, WL Ross and its affiliates and agents were immersed in the details of the management and operation of Homeward.  WL Ross held frequent meetings with senior executives to discuss operations, and had access to all of Homeward's books, records, and computer systems.

141.    Like other private equity firms, WL Ross routinely entered into contracts with its portfolio companies to charge them ongoing advisory and management fees.  WL Ross had such contracts with Homeward.  Pursuant thereto, WL Ross and/or its affiliates and agents charged Homeward hundreds of thousands of dollars a month in advisory and management fees.  WL Ross and those affiliates and agents earned every nickle of such enormous sums in fees by actually managing and controlling all material aspects of Homeward's business and operations, including, without limitation, Homeward's arrangements with QBE to receive below-cost services, the amounts that borrowers were charged for LPI, the amounts claimed in servicing "advances," and the contents of the communications to borrowers and servicing clients, as alleged above.  Indeed, those aspects of Homeward's business and operations were critical to Homeward's profitability and financial results, and, hence, demanded the attention of WL Ross.  Indeed, in the summer of 2008, WL Ross itself participated in the negotiations over the arrangements with QBE (then known as ZC Sterling),

as evidenced by the fact that WL Ross walked away from those negotiations with a kickback of warrants worth $85 million.

142.    Under its agreements with Homeward, WL Ross possessed and exercised authority over, *inter alia*, Homeward's budgets, business plans, capital expenditures, dispositions of assets, distributions of equity, incentive plans, performance targets, incurrence of debt, selection of auditors, decisions with respect to litigation and regulatory matters, and the hiring and firing of key personnel. WL Ross also possessed and exercised authority over Homeward's business practices and procedures with respect to LPI.

143.    In addition, WL Ross controlled whether Homeward would enter into material contracts, including specifically, any contracts with LPI vendors and loan servicing subcontractors. This is indicated by the fact that, as alleged above, in or about August 2008, WL Ross caused Homeward to enter into the six-year LPI and services contract with QBE (then known as ZC Sterling). WL Ross so exercised its control over Homeward as a *quid pro quo* for kickbacks, including, as alleged above, the warrants worth $85 million issued by ZC Sterling to WL Ross.  Indeed, ZC Sterling never would have issued such valuable warrants to WL Ross had WL Ross lacked such control or not promised to use it to secure ZC Sterling the six-year contract.

144.    WL Ross also had the authority to merge or sell Homeward or its assets, as indicated by the fact that, on December 27, 2012, WL Ross sold Homeward to Ocwen.

145.    Accordingly, at all relevant times, WL Ross had complete *de facto* control over Homeward and all aspects of Homeward's business and day-to-day operations.

146.    WL Ross's control is also illustrated by WL Ross's public participation in Homeward's affairs, and admitted intimate knowledge of and involvement in Homeward's operations.

39

In his public utterances, Ross routinely referred to WL Ross and Homeward collectively as "we," thus affirming that, in his view and in reality, Homeward was indistinguishable from WL Ross.

147.   For example, in April 2008, Homeward (then known as AHMSI) acquired the servicing assets of Option One Mortgage Corporation ("Option One"), a subsidiary of H&R Block, in a transaction that significantly expanded AHMSI's loan servicing portfolio.  WL Ross was intimately involved with and exercised complete control over all aspects of that transaction.  H&R Block's March 17, 2008 press release announcing the transaction did not even mention AHMSI.  It simply stated that H&R Block had signed a definitive agreement to sell Option One to "an entity sponsored by WL Ross & Co. LLC. (the 'Buyer'), a private equity firm."  The release also indicated that the "Buyer" in the transaction, *i.e.*, AHMSI, was represented by the law firm of Weil Gotshal & Manges, which was WL Ross's regular counsel.

148.   Additionally, in or about February 2009, Homeward (then known as AHMSI) acquired the servicing portfolio of Citi Residential Lending, the mortgage servicing unit of Citigroup, for $1.5 billion.  WL Ross was intimately involved with and exercised complete control over all aspects of that transaction as well.  Ross personally broke the news of the acquisition on *CNBC*'s *Squawkbox* program on February 5, 2009.  Ross also informed *National Mortgage News* of the transaction's specifics – for example, that the average loan size of the acquired portfolio was about $200,000, and that the aggregate unpaid principal balance of the acquired portfolio was about $37 billion.  Ross also explained the rationale for the transaction to *National Mortgage News*, stating that "[w]e feel that there are substantial economies of scale from adding a large block of mortgages to our existing platform, and we believe that our team has developed an excellent record in making modifications and dealing with REO."

149.     Ross also publicly discussed the WL Ross/Homeward agenda to acquire additional

servicing rights.  "We make no bones about the fact that we are in the market for servicing," Ross

stated.  "We really think we have the best team in the business at American Home," Ross also said,

referring to the individuals associated with and/or hand-picked by WL Ross that were named to key

management, executive, and operational roles at Homeward.

150.     On November 14, 2008, WL Ross and Homeward (then known as AHMSI) jointly

issued a statement in response to the Streamlined Mortgage Modification Plan ("SMP") introduced

by the FHFA.  "We strongly support this new program. . . .  For loans that do not meet the SMP

eligibility criteria, AHMSI will continue to use its industry-leading and proactive home preservation

approach," the statement declared.  Further, "we strongly encourage our investors and the investor

trade groups to support the use of the SMP, as enhanced with a net present value floor feature, for

securitizations not covered by the SMP," the statement said.

151.     Two days later, on November 16, 2010, Homeward (then known as AHMSI) issued

a press release announcing the hiring of David M. Applegate ("Applegate") as Homeward's new CEO

and President.   The release featured a statement by Ross, who was identified as the "CEO &

Chairman, WL Ross & Co. LLC, which acquired AHMSI in 2008."  The release quoted Ross as

stating that "Dave's depth and breadth of experience in the mortgage and banking industries and his

commitment to customers are major assets that will further strengthen the management team after a

period of strong growth in AHMSI's business."  As the release strongly suggested, WL Ross, and

Ross in particular, actively managed and controlled the selection of Applegate, a key Homeward

executive.

152.     For its own profit, WL Ross was motivated to, and did, cause Homeward to engage in the specific unlawful acts alleged in this complaint, thereby abusing Homeward's corporate form to perpetrate an injustice against Plaintiffs and the Class.

153.     WL Ross profited from the secret premium rebates alleged herein directly and indirectly.  As alleged above, WL Ross received the $85 million in warrants. WL Ross also profited from the increased profitability that Homeward derived from the premium rebates.  As alleged above, on December 27, 2012, WL Ross sold Homeward to Ocwen for approximately $750 million, which was $315 million more than WL Ross had paid for Homeward in the AHMIC liquidation in 2008. A material part or all of the profit that WL Ross realized on the sale of Homeward resulted from the premium rebates, which increased Homeward's profitability and value.  WL Ross also reaped substantial management fees from Homeward and dividends from its ownership of Homeward stock and preferred stock.

154.     By virtue of its dominion and control over Homeward, and its exercise thereof to cause Homeward to engage in the specific acts complained of in this lawsuit, WL Ross is liable for the violations committed by Homeward under principles of piercing the corporate veil and agency.

## IX.     TOLLING OF THE STATUTES OF LIMITATIONS

155.     The claims of Plaintiffs and the Class are subject to both equitable estoppel, stemming from the concealment by Defendants of the facts alleged herein, and equitable tolling, stemming from the Plaintiffs' inability to obtain adequate information to plead the claims alleged herein.  Defendants are estopped from relying on a statute of limitations defense because they purposefully concealed the misconduct alleged.  At all relevant times, Defendants maintained a shroud of secrecy around their illicit dealings.  Indeed, at all relevant times, Homeward deemed its dealings with QBE to constitute

a "confidential trade secret," and has sought to block the public disclosure of documents pertaining to those dealings under New York State's Freedom of Information Law.  Separate and apart from Defendants' acts of concealment, any applicable statutes of limitations are properly tolled because Plaintiffs and the Class did not know, and could not have learned, the facts underlying their claims until shortly before filing this action.  Plaintiffs had no means of learning the facts underlying the claims alleged herein because they were not entitled to audit Homeward's transactions.  Thus, they could not have discovered the secret premium rebates alleged herein or the resulting overstated LPI charges.

156.    Furthermore, at all relevant times Plaintiffs and the Class were relieved of any duty to investigate because they reasonably and justifiably relied on Homeward to fulfill its contractual duties under the mortgage loan contracts of Plaintiffs and the Class in good faith and in an honest manner, and to similarly execute its duties under the PSAs and servicing agreements with Homeward's servicing clients in good faith and in an honest manner.  Even assuming there had been some indication of wrongdoing (and there was none), and Plaintiffs and the Class had attempted to investigate, such investigation would have been futile because it would not have been possible until recently to uncover any specific information as to Defendants' involvement in the unlawful scheme alleged herein.

157.    Due to the complex, undisclosed, and self-concealing nature of the scheme alleged herein, neither Plaintiffs, nor any other member of the putative Class whose claims would otherwise be time-barred, possessed or could have possessed sufficient information or the requisite expertise to discover the misconduct alleged.  Plaintiffs only were able to discover the underlying basis for their claims with the assistance of counsel.

158.     Issues relating to mortgages and mortgage servicing have been in the news since the

2008 financial crisis.  Nevertheless, the news coverage generally related to improper foreclosure

practices.  It was not until January 2012 that any major national news outlets began publishing any

reports about secret premium rebates relating to the referral of LPI business.

159.     The first time *The New York Times* published a news article about such rebates was

on January 10, 2012.  *The New York Times* broke the story that Superintendent Lawsky of the DFS

was investigating several large banks in connection with improper practices relating to LPI, including

"kickbacks."  *See* "Big Banks Face Inquiry Over Home Insurance," *The New York Times* (Jan. 10,

2012).

160.     Prior to such time, there was insufficient coverage of allegations of secret premium

rebates relating to LPI to have put Plaintiffs or the Class on inquiry notice of Defendants' misconduct.

Indeed, on January 18, 2012, *American Banker* (a self-described "financial services trade journal"

with a readership of only approximately 31,000 that is "read by senior banking and financial services

executives as well as consultants, lawyers, accountants and other professionals who serve the

financial industry," and which previously published articles on force-placed insurance) observed that

Superintendent Lawsky's New York probe had finally "brought national attention to banks' alleged

self-dealing in the sale of force-placed insurance."  "Banks Face Thicket of Force-Placed Threats,"

*American Banker* (Jan. 18, 2012).

161.     Further, even had Plaintiffs or the Class been on inquiry notice of misconduct relating

to LPI in the mortgage servicing industry prior to January 10, 2012, despite diligent investigation they

would have had no specific factual basis to allege – or even suspect – that Homeward, WL Ross, or

QBE was involved in any misconduct until, at the earliest, May 21, 2012, when, as alleged above,

44

Massey testified to the pertinent transactions at the DFS LPI hearings.  Prior to May 21, 2012, there was simply no publicly available information that even a highly skilled investigator could have uncovered linking Homeward, WL Ross, and QBE to potential secret premium rebates relating to LPI on loans serviced by Homeward.  Prior to such time, Plaintiffs and the Class did not have an adequate factual basis to plead the claims alleged herein.

162.    Any applicable statutes of limitations should be equitably tolled inasmuch as, in the exercise of reasonable diligence, Plaintiffs and the Class could not have known of the violations alleged herein until, at the earliest, May 21, 2012.  Furthermore, any delay by Plaintiffs and the Class in asserting the claims herein is excusable because they could not reasonably have discovered the misconduct alleged herein absent specialized knowledge and/or assistance of counsel.

## X.    CLASS ACTION ALLEGATIONS

163.    Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(1), (b)(2) and (b)(3) on behalf of themselves and a nationwide class consisting of:

> all residential mortgage loan borrowers whose loans were serviced by Homeward who were charged for LPI, and who either paid such charges or made payments on their loans from which the charges were recouped, at any time from August 1, 2008 through August 31, 2014 (the "Class").

164.    The Class excludes Defendants and any entity in which any defendant has a controlling interest, and their officers, directors, legal representatives, successors, and assigns.

165.    The Class is so numerous that joinder of all members is impracticable.

166.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

167.    Plaintiffs' claims are typical of the claims of the Class.

45

168.    There are questions of law and fact common to the Class, including but not limited to:

      a.    Whether Defendants devised and carried out a scheme to defraud borrowers by overcharging them for LPI reimbursement;

      b.    Whether the scheme alleged herein constitutes mail or wire fraud, attempt to commit mail or wire fraud, or conspiracy to commit mail or wire fraud;

      c.    Whether the scheme alleged herein constitutes extortion, attempted extortion, or extortion conspiracy in violation of the Hobbs Act, 18 U.S.C. § 1951(a);

      d.    Whether the scheme alleged herein constitutes money laundering in violation of 18 U.S.C. §1956(a)(1);

      e.    Whether the scheme alleged herein constitutes a violation of RESPA, 12 U.S.C. §2607(a);

      f.    Whether Homeward breached borrowers' mortgage loan agreements and violated the covenants of good faith and fair dealing implied therein;

      g.    Whether Homeward operated as an alter-ego or agent of WL Ross and whether Homeward's corporate veil should be pierced; and

      h.    Whether Defendants are liable to Plaintiffs and the Class for damages and, if so, the measure of such damages.

169.    These and other questions of law and/or fact are common to the Class and predominate over any questions affecting only individual Class members.

170.    Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have no claims antagonistic to those of the Class. Plaintiffs have retained counsel experienced in complex nationwide class actions, including all aspects of litigation. Plaintiffs' counsel will fairly, adequately, and vigorously protect the interests of the Class.

171.    Class action status is warranted under Rule 23(b)(1)(A) because the prosecution of separate actions by or against individual members of the Class would create a risk of inconsistent or

varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants.

172.    Class action status is also warranted under Rule 23(b)(1)(B) because the prosecution of separate actions by or against individual members of the Class would create a risk of adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

173.    Class action status is also warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

174.    Class action status is also warranted under Rule 23(b)(3) because questions of law or fact common to the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## XI.    CLAIMS FOR RELIEF

### COUNT I

### VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. §§ 1961-1968 (Against all Defendants)

175.    Plaintiffs repeat and reallege each and every paragraph above as if set forth herein.

176.    Plaintiffs, each Class member, and each defendant are "persons," as that term is defined in 18 U.S.C. §§ 1961(3) and 1962(c).

47

**The Enterprise**

177.    For purposes of this claim, the RICO "enterprise" is an association-in-fact, as the term is defined in 18 U.S.C. §§ 1961(4) and 1962(c), consisting of Defendants including their respective officers, directors, employees, agents, and direct and indirect subsidiaries (the "Enterprise").  The Enterprise was separate and distinct from the persons that constituted the Enterprise.

178.    The Enterprise was managed and organized by Defendants.  Each of the Defendants agreed to, and did, participate in the conduct of the Enterprise, and carried out their roles using broad and independent discretion.

179.    The companies and individuals that constituted the Enterprise were associated for the common purpose of defrauding and extorting borrowers and defrauding servicing clients of Homeward by charging them overstated amounts for reimbursement of LPI with respect to Homeward-serviced loans.  The purpose thereof was to collect overstated sums in respect of such indemnification charges.  At all relevant times, the Enterprise was engaged in and its activities affected interstate commerce.  The proceeds of the Enterprise were distributed to Defendants.

180.    The Enterprise operated from at least August 2008 through August 2014.  The Enterprise had an ascertainable structure separate and apart from the pattern of racketeering activity in which Defendants engaged.

**The Pattern of Racketeering Activity**

181.    At all relevant times, in violation of 18 U.S.C. § 1962(c), Defendants conducted the affairs of the Enterprise through a pattern of racketeering activity as defined in RICO, 18 U.S.C. § 1961(5) by virtue of the conduct described in this complaint.  Defendants conducted the affairs of

48

the Enterprise and participated in the operation and management thereof at least through the following

conduct:

a.     Defendants perpetrated a scheme to overstate Homeward's LPI premium expenses, and, thereby, to recoup inflated amounts from borrowers in indemnification under their mortgages;

b.     Homeward, a loan servicer, entered into a six-year exclusive loan-servicing outsource contract with QBE (then known as ZC Sterling). A key term of the contract obligated Homeward (then known as AHMSI) to use LPI insurers affiliated with QBE, namely Empire and its successor QBE Insurance. In exchange, QBE agreed to pay Homeward tens of millions of dollars in secret premium rebates;

c.     Defendants disguised and camouflaged the premium rebates through multiple sham transactions involving affiliates and related parties, including, as alleged above: (i) $10 million paid for non-existent "marketing services"; (ii) warrants worth $85 million issued to Homeward's private equity sponsor, WL Ross, (iii) more than $16 million in bogus "insurance commissions" funneled through the Homeward subsidiary AIA; and (iv) approximately $25 million in below-cost loan-servicing outsourced service provided by QBE's non-insurance affiliate QBE FIRST;

d.     Homeward had no right under the mortgages to be reimbursed by borrowers for more than Homeward's actual LPI expense. Accordingly, Defendants should have subtracted the premium rebates from the amounts that borrowers were billed for LPI indemnification. Instead, however, Defendants pretended that the rebates did not exist, and fraudulently billed borrowers based on the full premiums. This enabled Homeward to keep the rebates for itself;

e.     Throughout the Class Period, Defendants issued mail and wire communications to borrowers incident to and in furtherance of the scheme, including monthly statements, bills and LPI notices. The communications overstated Homeward's LPI premium expenses and omitted disclosure of the premium rebates;

f.     Defendants recouped overstated sums for LPI reimbursement from borrowers loan payments and escrow accounts;

g.     To the extent borrowers defaulted, Defendants shifted the overstated LPI costs to Homeward's servicing clients, which were obligated to reimburse Homeward for any LPI premium expense not recouped from borrowers; and,

h.  Defendants issued mail and wire communications to the servicing clients, including periodic remittance reports, servicing reports, and attestations of compliance with servicing criteria. The communications overstated Homeward's LPI premium "advances" and omitted disclosure of the premium rebates.

### The Predicate Acts of Mail and Wire Fraud

182.  The pattern of racketeering activity consisted of mail and/or wire fraud in violation of 18 U.S.C. §§ 1341 and 1343. Specifically, Defendants engaged in an intentional scheme or artifice to defraud borrowers and servicing clients of Homeward and to obtain money or property from said borrowers and servicing clients through false or fraudulent pretenses, representations and promises.

183.  The conduct of Defendants in violation of the mail and wire fraud statutes included, without limitation, a fraudulent scheme to deprive borrowers and servicing clients of their intangible rights to Homeward's "honest services" through bribes and kickbacks in violation of 18 U.S.C. § 1346. Homeward, as servicer, was an assignee of the original lenders, stepped into the shoes of those lenders, and owed contractual obligations to borrowers to bill and credit their accounts in accordance with the mortgage terms. Homeward owed contractual obligations to Homeward's servicing clients under the PSAs. Homeward was obligated to execute its contractual duties in an honest manner.

184.  Nevertheless, Homeward misused its position as servicer to extract bribes and kickbacks from QBE at the expense of borrowers and servicing clients. Homeward thereby breached its obligations to render those victims "honest services." Each of the Defendants intentionally and wilfully conspired and participated in Homeward's "honest services" violations. Specifically, each of the Defendants participated in devising and carrying out the scheme through the activities alleged above.

185.   The bribes, kickbacks, false statements and omissions, and mail and/or wire communications of the Defendants in furtherance of the scheme, constituted predicate acts of mail and/or wire fraud.

186.   It was reasonably foreseeable to Defendants that the mails and/or wires would be used in furtherance of the scheme, and the mails and/or wires were in fact used to further and execute the scheme.

187.   The nature and pervasiveness of the Enterprise necessarily entailed frequent wire and/or mail transmissions.  The precise dates of such transmissions cannot be alleged without access to the books and records of Defendants.  Nevertheless, Plaintiffs allege such transmissions generally.

188.   For the purpose of furthering and executing the scheme, Defendants regularly transmitted and caused to be transmitted by means of wire communication in interstate commerce writings, electronic data and funds, and also regularly caused matters and things to be placed in post offices or authorized depositories, or deposited or caused to be deposited matters or things to be sent or delivered by a private or commercial interstate carrier.  For example:

   a.   QBE FIRST issued notices containing overstated LPI charges to borrowers via mail;

   b.   Homeward issued monthly statements and bills containing overstated LPI charges to borrowers via mail and/or electronically via wire;

   c.   Homeward issued remittance and servicing reports containing overstated LPI charges to servicing clients via the mail and/or electronically via wire;

   d.   Homeward paid QBE LPI premiums via wire;

   e.   Borrowers made their mortgage loan payments, which included the overstated LPI charges, via mail and/or wire;

51

f.      QBE Insurance funneled money derived from Homeward's LPI premiums to QBE FIRST by mail and/or wire;

g.      QBE paid AIA purported "commissions" via mail and/or wire; and,

h.      AIA transferred the "commissions" to Homeward by mail or wire.

189.    Each electronic and/or postal transmission was incident to an essential part of the scheme.  As detailed above, Defendants engaged in similar activities with respect to each member of the Class and with respect to each of Homeward's servicing clients.

190.    Additionally, each such electronic and/or postal transmission constituted a predicate act of wire and/or mail fraud in that each transmission furthered and executed the scheme to defraud borrowers and servicing clients.

191.    Defendants each participated in the scheme to defraud knowingly, wilfully and with a specific intent to defraud borrowers and servicing clients into paying and/or incurring falsely overstated, unauthorized charges in connection with LPI.

192.    The predicate acts of mail and wire fraud constitute a pattern of racketeering activity as defined in 18 U.S.C. § 1961(5).  The predicate acts were not isolated events, but related acts aimed at the common purpose and goal of defrauding borrowers and servicing clients to pay and incur the falsely overstated, unauthorized charges with respect to LPI and thereby enable Defendants to reap illicit profits.

193.    Defendants were common participants in the predicate acts.  Their activities amounted to a common course of conduct, with similar pattern and purpose, intended to deceive borrowers and servicing clients.

**The Predicate Acts of Extortion, Attempted Extortion
And Conspiracy to Commit Extortion**

194.    Defendants' pattern of racketeering activity also consisted of extortion, attempted extortion, and conspiracy to commit extortion in violation of the Hobbs Act, 18 U.S.C. § 1951(a).

195.    As alleged above, Homeward had no right under borrowers' mortgages to be reimbursed for more than it actually spent buying the LPI.  Defendants, however, billed borrowers based on the full stated LPI premiums, *i.e.*, materially in excess of Homeward's true expense.

196.    At all relevant times, by virtue of the conduct alleged above, Defendants induced, and attempted and conspired to induce, Plaintiffs and the Class to pay these extra-contractual sums, not lawfully owed under their mortgage loan agreements, through the wrongful use of actual or threatened fear of economic harm.  Specifically, Defendants used, and attempted and conspired to use, the actual or threatened fear of foreclosure to induce Plaintiffs and the Class to pay the improper charge.

197.    As alleged above, borrowers' mortgage instruments provided that the expense of any LPI premiums "shall become additional debt of Borrower secured by this Security Instrument . . . ," and that the lender or its authorized servicer was entitled to foreclose to collect any amounts that were unpaid.

198.    Defendants issued notices to borrowers explicitly warning that the LPI charges were "your responsibility."  Defendants also added those charges to borrowers' monthly bills.

199.    Mortgage loan servicers routinely collect unpaid LPI charges by foreclosing.  Based on his investigation, Superintendent Lawsky found that LPI charges frequently "push distressed homeowners over the foreclosure cliff."

200.    By virtue of the facts alleged above, Plaintiffs and the Class reasonably believed: (i) that Defendants possessed the power to collect any unpaid LPI charges through foreclosure; and (ii) that Defendants would exploit that power and foreclose if borrowers failed to pay the LPI charges.

201.    Additionally, by virtue of the facts alleged above, Defendants agreed to engage in the acts alleged above, and intentionally performed acts, including, without limitation, the acts alleged above, that, under the circumstances as Defendants believed them to be, constituted violations of the Hobbs Act and/or substantial steps in the commission of a Hobbs Act violation, in that, *inter alia*, they exploited the fears of economic loss of Plaintiffs and the Class to obtain money to which Defendants were not legally entitled.  Moreover, Defendants thereby affected and intended to affect interstate commerce.

202.    Plaintiffs and the Class received nothing of value in exchange for payment of the excess LPI charges.

## The Predicate Acts of Money Laundering

203.    The pattern of racketeering activity also consisted of money laundering in violation of 18 U.S.C. §1956(a)(1).  Pursuant to 18 U.S.C. §1956(a)(1), money laundering is defined, in pertinent part, as follows:

> whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity with the intent to promote the carrying on of specified unlawful activity knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.

54

204.   Defendants disguised and camouflaged the proceeds of their mail fraud, wire fraud, and Hobbs Act violations alleged above through a series of transactions designed to conceal the nature, location, source and ownership of such proceeds.  These transactions included the multiple sham transactions, alleged above, to conceal the premium rebates from borrowers, servicing clients, and regulators.  Specifically, as alleged in detail above, Defendants:

    a.   disguised the $10 million in premium rebates as a supposed "one-time marketing services payment;"

    b.   disguised and concealed $85 million in premium rebates by paying them in warrants rather than cash, and to a third-party, WL Ross;

    c.   Disguised and concealed more than $16 million in premium rebates by funneling them through a third-party, AIA, and fraudulently denominating them as "insurance commissions;" and,

    d.   disguised and concealed an estimated $25 million in premium rebates by paying them in the form of below-cost loan-servicing outsource services under a purportedly independent, arms' length, non-insurance agreement.

205.   Defendants intentionally engaged in, and benefitted from, the money laundering activities described herein.  Defendants conducted such transactions knowing and intending that they were designed to promote and conceal the proceeds of their mail fraud, wire fraud, and Hobbs Act violations.

### Injury to Plaintiffs and the Class

206.   As a direct and proximate result of violations of 18 U.S.C. § 1962(c) by Defendants, Plaintiffs and the Class have been injured in their business or property within the meaning of 18 U.S.C. § 1964(c).  Plaintiffs and the Class paid overstated, contractually unauthorized LPI charges by reason, and as a direct, proximate and foreseeable result, of the scheme alleged.

207.     Under the provisions of 18 U.S.C. § 1964(c), the Defendants are jointly and severally liable to Plaintiff and the Class for three times the damages sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

208.     WL Ross is liable for the RICO violations committed by Homeward under principles of piercing the corporate veil and agency.

**COUNT II**

**CONSPIRACY TO VIOLATE THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(d)**
**(Against all Defendants)**

209.     Plaintiffs repeat and reallege each and every paragraph above as if set forth herein.

210.     RICO, 18 U.S.C. § 1962(d), provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

211.     Defendants have violated 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c).

212.     As set forth in Count I, above, at all relevant times, Plaintiffs and the Class were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1962(c).

213.     As also set forth in Count I, above, at all relevant times, Defendants were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1962(d).

214.     Defendants formed the previously alleged association-in-fact Enterprise, within the meaning of 18 U.S.C. § 1961(4), for the common purpose of fraudulently overcharging borrowers and servicing clients with respect to LPI.  The purpose thereof was to induce borrowers and servicing clients to pay or incur fraudulently overstated, unauthorized charges with respect to LPI.

56

215.    The Enterprise was engaged in, and its activities affected interstate commerce within the meaning of 18 U.S.C. § 1962(c).

216.    As set forth in Count I, above, Defendants conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) in violation of 18 U.S.C. § 1962(c).

217.    Defendants were each associated with the Enterprise and agreed and conspired to violate 18 U.S.C. § 1962(c), and agreed to conduct and participate, directly or indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d).

218.    Defendants committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof, including but not limited to the acts set forth in Count I.

219.    As a direct and proximate result of the overt acts and predicate acts of Defendants in furtherance of violating 18 U.S.C. §1962(d) by conspiring to violate 18 U.S.C. § 1962(c), Plaintiffs and the Class have been and are continuing to be injured in their business and property in an amount to be determined at trial.  Such injuries include, but are not limited to, fraudulently overstated charges with respect to LPI, as a direct, proximate and foreseeable result of the scheme alleged herein.

220.    Under the provisions of 18 U.S.C. § 1964(c), the Defendants are jointly and severally liable to Plaintiff and the Class for three times the damages sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

221.    WL Ross is liable for the RICO conspiracy violations committed by Homeward under principles of piercing the corporate veil and agency.

## COUNT III

### VIOLATION OF RESPA, 12 U.S.C. § 2607(a)
### (Against all Defendants)

222.    Plaintiffs repeat and reallege each and every paragraph above as if set forth herein.

223.    Plaintiffs' loans and those of the members of the Class are "federally related" mortgage loans within the meaning of RESPA.

224.    Throughout the Class Period, Defendants provided "settlement services" with respect to "federally-related mortgage loans," as such terms are defined by RESPA, 12 U.S.C. §§ 2602(1) and (3).

225.    Pursuant to 12 U.S.C. § 2607(a), Defendants were prohibited from giving or accepting any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, for the referral of any business "incident to or a part of a real estate settlement service involving a federally related mortgage loan."

226.    HUD, in regulations relating to RESPA, has defined the term "settlement" as "the process of executing legally binding documents regarding a lien on property that is subject to a federally related mortgage loan."  24 C.F.R. § 3500.2(b).

227.    Also in regulations relating to RESPA, HUD has defined a "settlement service" as "any service provided in connection with a prospective or actual settlement" – a definition that specifically includes the "provision of services involving hazard, flood, or other casualty insurance." 24 C.F.R. § 3500.2(b)(11).

228.    The provision of LPI constitutes a "settlement service" under RESPA.  At a minimum, the provision of LPI constitutes business "incident to," if not "a part of," a real estate settlement service under 12 U.S.C. § 2607.

229.    QBE unlawfully gave, and Homeward and WL Ross unlawfully received, "kickbacks" within the meaning of RESPA, 12 U.S.C. § 2602(2), in connection with the referral of LPI business.  As alleged above, the kickbacks consisted of $10 million in cash, warrants worth $85 million, $16 million in phony "insurance commission," and approximately $25 million in below-cost tracking and administrative services.

230.    Such consideration constituted fees, kickbacks or things of value pursuant to an agreement that LPI business would be referred to QBE.  These practices violated RESPA, 12 U.S.C. § 2607(a).

231.    Plaintiffs and the Class were actually harmed by Defendants' unlawful scheme.

232.    Defendants therefore violated Section 8(a) of RESPA.  Pursuant to RESPA, 12 U.S.C. § 2607(d), Defendants are jointly and severally liable to Plaintiffs and the Class in an amount equal to three times the amounts they have paid with respect to LPI.

233.    In accordance with RESPA, 12 U.S.C. § 2607(d), Plaintiffs seek attorneys' fees and costs of suit on behalf of themselves and the Class.

234.    WL Ross is liable for the RESPA violations committed by Homeward under principles of piercing the corporate veil and agency.

## COUNT IV

### BREACH OF CONTRACT
### (Against Homeward and WL Ross)

235.    Plaintiffs repeat and reallege each and every paragraph as if fully set forth herein.

236.    Homeward was an assignee of rights and obligations under the mortgages.  At all relevant times, Homeward, as the servicer, stood in the shoes of the original lenders, accepted their obligations and possessed their same rights, including with respect to LPI.  Reflecting this fact, Homeward named itself, not the servicing clients that owned the loans, as the "policyholder" and "Named Insured Mortgagee" of the LPI policies.  Homeward also issued monthly statements and bills to borrowers in its own name, demanding that borrowers make their payments to Homeward. Additionally, Homeward routinely files foreclosure complaints in its own name, identifying itself as the lawful "mortgagee" entitled to the borrowers' payments, to foreclose, and to the proceeds of foreclosure.

237.    Homeward breached the mortgage instruments of Plaintiffs and the Class by overcharging them for LPI.  Homeward had a right under the mortgages to be indemnified by Plaintiffs and the Class for the expense of the LPI premium.  By virtue of the conduct alleged above, however, Homeward charged borrowers materially in excess of Homeward's true expense. Homeward thereby recouped inflated sums from borrowers' loan payments and escrow accounts. This conduct constituted a breach because Homeward had no right under the mortgages to be reimbursed for more than it actually spent for the LPI.

238.    As a direct, proximate, and legal result of Homeward's breach of contract, Plaintiffs and the Class have suffered damages.

239.    WL Ross is liable for Homeward's breaches of contract under principles of piercing the corporate veil and agency.

## COUNT V

## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (Against Homeward and WL Ross)

240.    Plaintiffs repeat and reallege each and every paragraph above as if set forth herein.

241.    Every contract, including the mortgage loan contracts of Plaintiffs and the Class, contains an implied covenant of good faith and fair dealing.

242.    Pursuant to the implied covenant of good faith and fair dealing, Homeward was obligated to perform its duties and exercise its rights under the mortgage loan agreements in good faith and to deal fairly with Plaintiffs and the Class.

243.    Homeward breached its duty of good faith and fair dealing by overstating its LPI premium expense, omitting disclosure of the premium rebates that is received, and recouping inflated sums from borrowers in LPI reimbursement.  Homeward dealt with Plaintiffs and the Class unfairly, and contravened the reasonable expectations of Plaintiffs and the Class.

244.    As a direct, proximate, and legal result of the aforementioned breaches of the covenant of good faith and fair dealing, Plaintiffs and the Class have suffered damages.

245.    WL Ross is liable for Homeward's breaches of the covenant of good faith and fair dealing under principles of piercing the corporate veil and agency.

## COUNT VI

## COMMON LAW RESTITUTION/UNJUST ENRICHMENT/DISGORGEMENT
### (Against Homeward and WL Ross)

246.    Plaintiffs repeat and reallege each and every paragraph above as if set forth herein.

247.    Plaintiffs and the Class conferred a substantial benefit on Homeward and WL Ross based by paying overstated charges with respect to LPI, from which Homeward and WL Ross received premium rebates.  These benefits came at the expense of Plaintiffs and the Class.

248.    The circumstances are such that in equity and good conscience restitution should be made by Homeward and WL Ross to Plaintiffs and the Class.

249.    As a result of Homeward's and WL Ross's unjust enrichment, Plaintiffs and the Class have sustained damages in an amount to be determined at trial.  Plaintiffs and the Class seek full disgorgement and restitution of Homeward's and WL Ross's enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful or wrongful conduct alleged above.

250.    Plaintiffs and the Class are entitled to restitution and/or disgorgement of premium rebates and profits realized by Homeward and WL Ross as a result of their unfair, unlawful and/or deceptive practices.

251.    WL Ross is directly liable for its own unjust enrichment.  Additionally, WL Ross is liable for Homeward's unjust enrichment under principles of piercing the corporate veil and agency.

62

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter a judgment against Defendants and in favor of Plaintiffs and the Class and award the following relief:

a.  An order declaring that this action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, and for an order certifying this case as a class action and appointing Plaintiffs as representative of the Class;

b.  An order awarding compensatory damages on behalf of Plaintiffs and the Class in an amount to be proven at trial;

c.  Judgment for Plaintiffs and the Class on their claims in an amount to be proven at trial, for compensatory damages caused by Defendants' practices, along with exemplary damages to each Class member for each violation;

d.  Judgment for Plaintiffs and the Class on their RICO claims and RESPA claims, in an amount to be proven at trial, for three times the amount of the excess charges imposed on Plaintiffs and the Class;

e.  Restitution of an amount equal to all improperly collected charges and interest, and the imposition of an equitable constructive trust over all such amounts for the benefit of Plaintiffs and the Class;

f.  Pre-judgment and post-judgment interest as provided for by law or allowed in equity;

g.  An order awarding Plaintiffs and the Class their attorneys' fees and costs; and

h.  Such other and further relief as may appear necessary and appropriate.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a trial by jury of the claims

alleged herein.

Dated: September 10, 2014

KIRBY McINERNEY LLP

By: _____

Mark A. Strauss (mstrauss@kmllp.com)
Thomas W. Elrod (telrod@kmllp.com)
825 Third Avenue, 16th Floor
New York, New York 10022
Tel:  (212) 371-6600
Fax: (212) 751-2540

*Attorneys for Plaintiffs*
